UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| HANS BRUNS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:12-cv-00131-JAW |
| | ) | |
| | ) | |
| MARY MAYHEW, Commissioner, | ) | |
| Maine Department of Health and | ) | |
| Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON COMISSIONER'S MOTION TO DISMISS**

Hans Bruns, on behalf of himself and a proposed class of Maine residents, requests that the Court declare Public Law 2011, chapter 380, section KK-4 unconstitutional and grant a preliminary and permanent injunction enjoining Mary Mayhew, the Commissioner of the Maine Department of Health and Human Services, from enforcing the law and ordering her to restore MaineCare benefits to Mr. Bruns and his proposed class. Mr. Bruns claims the Maine law violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because it discriminates against noncitizens in favor of citizens in the administration of MaineCare benefits. The Commissioner moves to dismiss Mr. Bruns's Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The Court dismisses without prejudice the Commissioner's motion to dismiss because the Commissioner's

position is founded on a disagreement with factual allegations in Mr. Bruns's Complaint that the Court must accept as true.

## I.     STATEMENT OF FACTS

### A.     Procedural Background

On April 4, 2012, Mr. Bruns filed a class action complaint against Commissioner Mayhew in her official capacity. *Class Action Compl. for Declaratory and Inj. Relief* (ECF No. 1) (*Compl.*).   On the same day, Mr. Bruns moved for class certification, *Pl.'s Mot. for Class Certification* (ECF No. 4), and for a preliminary injunction, *Pl.'s Mot. for Prelim. Inj.* (ECF No. 5).   On May 11, 2012, Commissioner Mayhew moved to dismiss Mr. Bruns's Complaint pursuant to Rule 12(b)(6), *Def.'s Mot. to Dismiss* (ECF No. 12) (*Def.'s Mot.*), and opposed Mr. Bruns's motions for class certification and preliminary injunction.   *Def.'s Opp'n to Pl.'s Mot. for Class Certification* (ECF No. 14); *Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj.* (ECF No. 13).

On May 25, 2012, Mr. Bruns filed his opposition to Commissioner Mayhew's motion to dismiss.   *Pl.'s Opp'n to Def.'s Mot. to Dismiss* (ECF No. 17) (*Pl.'s Opp'n*). He also replied to Commissioner Mayhew's response to his motions for class certification and preliminary injunction.   *Pl.'s Reply Mem. in Supp. of Class Certification* (ECF No. 15); *Pl.'s Reply Mem. in Supp. of Prelim. Inj.* (ECF No. 16). On June 7, 2012, Commissioner Mayhew filed a reply in support of her motion to dismiss.   *Def.'s Reply in Supp. of Mot. to Dismiss* (ECF. No. 18) (*Def.'s Reply*).

### B.     The Allegations[1]

### 1.     Federal Medicaid and MaineCare Frameworks

Medicaid is a jointly-funded state and federal program that provides medical assistance to low-income individuals. *Compl.* ¶ 23.  In 1973, the Maine Legislature enacted Aid to Needy Persons, Public Law 1973, chapter 790, codifying its decision to provide Medicaid coverage to all qualified individuals regardless of their immigration status and alienage. *Id.* The state of Maine's Medicare program is called MaineCare and Maine DHHS is responsible for administering MaineCare to Maine residents. *Id.*

In 1996, Congress changed the eligibility requirements for federal Medicaid with its enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Public Law No. 104-193, 110 Stat. 2105 (1996). *Id.* ¶ 24.  The Act divided noncitizens into two groups for Medicaid eligibility:  qualified and non-qualified aliens. *Id.* Qualified aliens include lawful permanent residents and certain other specified groups of individuals, such as asylees and refugees. *Id.* PRWORA further divided qualified aliens into two groups for Medicaid eligibility based upon the length of each alien's residency in the United States. *Id.* The law generally made Medicaid benefits unavailable to qualified aliens residing in the United States after August 22, 1996 until the aliens had resided in the United States for at least five years with qualifying status. *Id.*

---

[1] In ruling on a motion to dismiss, a Court must take as true all well-pleaded facts in the complaint. *Schatz v. Republican State Leadership Comm.-Me. PAC*, 669 F.3d 50, 55 (1st Cir. 2012).  The Court has therefore recited the well-pleaded facts as set forth in Mr. Bruns's Complaint.

Nevertheless, the law provided that these noncitizens could receive medical assistance for care and services required to treat emergency medical conditions even though they had not satisfied the residency requirement.  *Id.* ¶ 25.

PRWORA also authorized states to decide whether to provide health benefit services to Medicaid-ineligible noncitizens residing within their borders.  *Id.* ¶ 26. In response to PRWORA, the Maine Legislature voted unanimously to pass Temporary Assistance to Needy Families (TANF), Public Law 1997, chapter 530, section A-16, and to provide state-funded health benefit coverage to all legal noncitizens "'who would be eligible for the TANF or Medicaid programs but for their status as aliens under PRWORA.'"  *Id.* ¶ 27.  However, in June 2011, the Maine Legislature passed Public Law 2011, chapter 380, section KK-4, which terminated health benefit coverage to Medicaid-ineligible aliens granted by the 1997 law.  *Id.* ¶ 3, 28.  DHHS implemented the new law through emergency rulemaking on September 1, 2011, and it was permanently adopted effective December 5, 2011.  *Id.*

### 2.   Mr. Bruns's Medical Condition and His Loss of State Health Care Coverage

Hans Bruns resides in Fort Fairfield, Maine.  *Id.* ¶ 9.  Mr. Bruns became a United States lawful permanent resident on December 16, 2007.  *Id.* ¶ 9, 29.  He is indigent and, because of his low income, cannot afford to pay for private health insurance.  *Id.* ¶ 29.  On or about December 2010, Mr. Bruns began to receive health insurance benefits through MaineCare.  *Id.* ¶ 9, 29, 31.  On September 1, 2011, DHHS sent form termination notices to approximately five hundred noncitizens living in Maine, including Mr. Bruns, informing them that their

4

MaineCare coverage was being reduced to emergency care only.  *Id.* ¶ 3.  The State terminated Mr. Bruns's benefits effective October 1, 2011.  *Id.* ¶ 9, 31.

After experiencing pain on the right side of his face for more than a year and seeking treatment for a mass on the right side of his neck, Mr. Bruns was diagnosed in late 2011 or early 2012 with adenoid cystic carcinoma of the right parotid gland and an apparent lesion in his lung.  *Id.* ¶ 10, 30.  Mr. Bruns experiences extreme pain and suffering, which impacts his ability to sleep, hear, and swallow because of the large cancerous tumor in his neck.  *Id.* ¶ 1.

Without full MaineCare benefits, Mr. Bruns cannot afford the medical care required to cure his condition, which includes services such as MRI imaging, resection of the lesion, radiation, and chemotherapy.  *Id.* ¶ 1, 10, 32.  Emergency care benefits under the State's current MaineCare program cannot provide Mr. Bruns with the necessary medical services to treat his condition.  *Id.* ¶ 10.  Absent treatment, Mr. Bruns's condition will continue to cause him extreme pain and may ultimately result in his death.  *Id.* ¶ 10, 30.

## II.   PARTIES' POSITIONS

### A.   The Commissioner's Motion to Dismiss

"[F]undamentally," Commissioner Mayhew argues, "plaintiff's claim fails for the simple reason that the facts here do not make out a violation of the Equal Protection Clause."  *Def.'s Mot.* at 2, 8.  She claims that Mr. Bruns's Complaint should be dismissed primarily because: (1) the state cancelled a benefit that was exclusively provided to noncitizens and (2) the disparate treatment of noncitizens is

5

a result of federal, not state law.  *Id.*  Commissioner Mayhew concedes that the state of Maine terminated a program that provided state benefits for aliens who were ineligible for federal Medicaid.  *Id.*  However, because the State no longer offers the state benefit at issue here to anyone, she asserts there has not been an Equal Protection Clause violation.  *Id.*

Pointing out that "the state medical assistance benefit at issue here is not—and never was—available to United States citizens," Commissioner Mayhew argues that Mr. Bruns has failed to show that noncitizens and citizens were "'similarly situated 'in all relevant respects.'"  *Id.* at 9.  She supports her position with a series of cases from other jurisdictions where courts rejected noncitizens' Equal Protection claims in similar circumstances.  *Id.* at 10-12.  Specifically, Commissioner Mayhew highlights the similarities between this case and *Pimentel v. Dreyfus*, 670 F.3d 1096 (9th Cir. 2012) and *Hong Pham v. Starkowski*, 16 A.3d 635 (Conn. 2011).  *Id.* at 10-11.  Commissioner Mayhew argues that "the weight of authority confirms that Equal Protection is not violated by the elimination of a state program that, like Maine's, serves only aliens."  *Id.* at 12.

Next, Commissioner Mayhew contends that Mr. Bruns's claim that he has been selectively treated rests on "semantics."  *Id.*  She asserts that by using the term "MaineCare", Mr. Bruns "hopes to obscure the distinction between the Medicaid benefits administered by the State, for which federal law denies plaintiff eligibility, and the state medical assistance benefits Maine previously offered to Medicaid-ineligible aliens" so that he can be considered "similarly situated" to

citizens receiving federal benefits. *Id*. at 13. Commissioner Mayhew insists that Mr. Bruns never received the same MaineCare benefits provided to citizens. *Id*. Instead, she explains that he received "state medical assistance benefits that were, admittedly, often inaccurately referred to as 'MaineCare' benefits." *Id*.

Analogizing the facts here to *Pimentel*, Commissioner Mayhew emphasizes that the two medical programs in this case were created by two different governments over thirty years apart and that Medicaid is a creature of federal law whereas Maine's medical assistance program for Medicaid-ineligible aliens arose only from state law. *Id*. at 14-15. Commissioner Mayhew also highlights that the funding for the two programs is different. *Id*. at 15. "In sum," she argues, "this case involves mutually exclusive state and federal benefits, created by separate governments and governed by distinct laws." *Id*.

Commissioner Mayhew contends that "the provisions of the Welfare Act [PRWORA] unquestionably lie at the core of this suit." *Id*. at 16. She acknowledges that the state of Maine voluntarily intervened and created a program to provide healthcare to Medicaid-ineligible noncitizens; however, she points out that "the State was not required . . . to create a state program to remedy the effects of Congress's action" and that the State should not be penalized "for its initial generosity by enjoining the termination of that program." *Id*. Commissioner Mayhew argues that because the real issue concerns PRWORA, a congressionally-enacted statute, the standard of review in this case should be rational basis instead of strict scrutiny. *Id*.

Finally, Commissioner Mayhew contends that the argument—"once Maine *voluntarily* extended medical assistance benefits to Medicaid-ineligible aliens, the Equal Protection Clause prevented the State from reversing course"—is without merit. *Id.* at 19 (emphasis in original).   She argues that if the Court were to adopt this logic, the Equal Protection Clause would become "a one-way ratchet." *Id.*

### B.   Mr. Bruns's Opposition

Mr. Bruns responds that "[t]he State of Maine's discriminatory conduct in enacting P.L. 2011, Ch. 380, § KK-4, and the Defendant's administration of that law is plainly a classification based upon alienage and therefore subject to strict scrutiny." *Pl.'s Opp'n* at 5.  He claims that Commissioner Mayhew uses "word play" to avoid the application of strict scrutiny to the facts of this case by attempting to distinguish MaineCare from an alleged separate state health benefit program for noncitizens. *Id.*

Mr. Bruns contends that "in reality . . . both citizens and non-citizens were enrolled in the same MaineCare program." *Id.* at 1.  He argues that "non-citizens entered the program by filling out the exact same MaineCare application; their eligibility was determined pursuant to the exact same guidelines; and they received the exact same MaineCare cards that entitled them to receive the exact same MaineCare benefits." *Id.*  Therefore, Mr. Bruns insists that Commissioner Mayhew cannot "justify her wrongful conduct by now claiming that [ ] [he] and members of the putative class were enrolled in a separate unnamed, secret program." *Id.*  He states that, contrary to Commissioner Mayhew's arguments, "MaineCare is not just

a meaningless label" and insists that DHHS's references to MaineCare benefits for noncitizens were not mistakes. *Id.* at 7.

Mr. Bruns also makes a historical argument, linking MaineCare to its predecessor, the Maine Medical Assistance Program. *Id.* at 7-10. He notes that when enacting legislation to provide medical benefits to noncitizens in spite of PRWORA, it "was no accident" that the Legislature referenced "'medical assistance.'" *Id.* at 9. Further, Mr. Bruns insists that Commissioner Mayhew's argument that two separate programs existed based on their different funding structures is a red herring. *Id.* at 11. Instead he explains, "[t]he providers that render services to individuals enrolled in MaineCare were paid by the same entity: the [s]tate of Maine." *Id.*

Mr. Bruns asserts that Commissioner Mayhew's arguments require the Court to look "beyond the allegations in the Complaint and resolve the factual dispute she is attempting to create surrounding whether MaineCare was a single program." *Id.* at 5. Mr. Bruns cites First Circuit precedent to underscore that civil rights actions are not subject to a heightened pleading standard. *Id.* at 6. Moreover, Mr. Bruns argues that Commissioner Mayhew's concession that the health benefit termination was based on alienage combined with the facts alleged in his Complaint, clearly establish that his Complaint must survive a Rule 12(b)(6) motion. *Id.* He argues that Commissioner Mayhew's reliance on *Pimentel* and *Hong Pham* is misplaced because "both involved the termination of entirely separate and distinct programs that included only non-citizens." *Id.* at 13.

9

Finally, Mr. Bruns clarifies that he is pursuing this lawsuit to remedy a wrong committed not by the federal government, but by Commissioner Mayhew and her agency.  *Id.* at 14.  In passing PRWORA, Mr. Bruns argues, Congress "did not prescribe[] a national uniform immigration policy with regard to access to medical case," but "authorized individual states to decide for themselves whether to provide medical care for medically indigent aliens who had been in the country less than five years."  *Id.* at 15.  Mr. Bruns asserts that the correct standard of review for this case should be strict scrutiny.[2]  *Id.* at 15-16.  Thus, he argues that "[t]he absence of a national, uniform policy forecloses the Defendant's position that her discriminatory action was consistent with Constitutional principles."  *Id.* at 17.

## C.     The Commissioner's Reply to Mr. Bruns's Opposition Motion

Commissioner Mayhew insists that Mr. Bruns's historical account of the MaineCare program is "simplistic" and overlooks the intervening events in the mid-1990s when Congress passed PRWORA and the State stepped in to provide benefits for Medicaid-ineligible aliens.  *Def.'s Reply* at 2.  Given her "more accurate" historical account, Commissioner Mayhew urges that "[i]t is simply not the case that Maine has operated a unitary state medical assistance program since 1973."  *Id.* at 2-3.

Citing *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009), Commissioner Mayhew rejects Mr. Bruns's assertion that she is asking the Court to

---

[2]     Citing *Soskin v. Robertson*, 353 F.3d 1242 (10th Cir. 2004), Mr. Bruns acknowledges that "[o]ne court has concluded that PRWORA reflected a national policy of granting discretion to the states", but he distinguishes that case as "incorrectly decided . . . because a national policy of granting discretion to individual states is, by definition, not a uniform policy, [ ] [and] puts the case at odds with the Supreme Court's decision in *Graham*."  *Pl.'s Opp'n* at 17.

employ a heightened pleading standard at this point in the litigation. *Id.* Acknowledging that a court may not "peer behind [the] factual allegations in the case" in ruling on a motion to dismiss, she points out that a court is not bound to accept a legal conclusion couched as a factual allegation. *Id.* at 3-4. She insists that "the nature and relationship between the two programs at issue here is patently a legal question." *Id.* at 4. Citing *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011), she states that "[t]he characteristics distinguishing the state and federal benefits—their legal basis, legislative history, and funding source—are all matters of public record appropriate for consideration on a motion to dismiss." *Id.* at 4 n.3.

Next, Commissioner Mayhew contends that Mr. Bruns overstates the significance of DHHS's admittedly inaccurate references to MaineCare as the program responsible for providing post-PRWORA health benefits to Medicaid-ineligible aliens. *Id.* at 3 n.1. Pursuant to *Pimentel*, she emphasizes that what matters is not the appearance of a single program but the "'legal reality that the state and federal benefits were created by separate governments at different points in history, arose from and were subject to distinct laws, and were primarily funded by different sovereigns.'" *Id.* (quoting *Pimentel*, 670 F.3d at 1107-08). Furthermore, she states that Mr. Bruns "apparently mistakes [ ] candor . . . for an admission" of discrimination in her motion to dismiss. *Id.* at 3 n.2. Commissioner Mayhew maintains that in her motion to dismiss, she simply clarified that the state benefits at issue were never offered to citizens, and therefore the State did not engage in

selective treatment of noncitizens vis-à-vis any other group when it terminated health benefits for Medicaid-ineligible qualified aliens.  *Id.*

Finally, Commissioner Mayhew contends that the cases Mr. Bruns relies on to support his Equal Protection argument, are factually distinct from this case.  *Id.* at 5.  She explains that *Aliessa ex rel. Fayad v. Novello*, 754 N.E.2d 1085 (N.Y. 2001), and *Fitch v. Commonwealth Health Insurance Connector Authority*, 946 N.E.2d 1262 (Mass. 2011) are not analogous because each of the state health benefit programs in those cases served both citizens and aliens.  *Id.*  She states "plaintiff's attempt to analogize the[se] [cases] to the present case depends entirely on his mischaracterization of the state and federal benefits here as a single state benefit." *Id.*

## III.    DISCUSSION

### A.    Legal Standard

According to Rule 8(a), "a pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  The United States Supreme Court has observed that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a motion to dismiss, the plaintiff must plead "sufficient facts to show that he has a plausible entitlement to relief."  *Sanchez,* 590 F.3d 31, 41 (1st Cir. 2009) (quoting

*Iqbal*, 556 U.S. at 678). The First Circuit illuminated the proper analytic path in *Schatz*:

> Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements. Step two: take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.

669 F.3d at 55 (citing *Ocasio-Hernandez v. Fortuna-Burset*, 640 F.3d 1, 7, 11-12 (1st Cir. 2011)). Although the Court must accept all factual allegations in the complaint as true, it is not bound to credit "bald assertions, unsupportable conclusions, and opprobrious epithets." *Campagna v. Massachusetts, Dep't of Env't Prot.,* 334 F.3d 150, 155 (1st Cir. 2003) (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 16 (1st Cir. 1989)). Instead, "plaintiffs are obligated to set forth in their complaint 'factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory.'" *Dartmouth Review*, 889 F.2d at 16 (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988)).

Generally, in deciding a motion to dismiss under Rule 12(b)(6), a court "may properly consider only facts and documents that are part of or incorporated into the complaint; if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." *Trans-Spec Truck Service, Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (citing *Garita Hotel, Ltd. P'ship v. Ponce Fed. Bank*, 958 F.2d 15, 18 (1st Cir. 1992)). At the same time, there is a narrow exception "for

documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents referred to in the complaint." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 34 (1st Cir. 2001) (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)); *Knowlton v. Shaw*, 708 F. Supp. 2d 69, 75 (D. Me. 2010) (citing *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009)). Furthermore, in ruling on a Rule 12(b)(6) motion to dismiss, the Court "can consider (a) 'implications from documents' attached to or fairly 'incorporated into the complaint,' (b) 'facts' susceptible to 'judicial notice,' and (c) 'concessions' in plaintiff's response to the motion to dismiss.'" *Schatz*, 669 F.3d at 55-56; *Haley*, 657 F.3d at 46 (A court "may augment the[ ] facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice").

### B.    The Equal Protection Clause

In his Complaint, Mr. Bruns claims that Ms. Mayhew's "denial of benefits to otherwise eligible persons based solely upon their alienage and immigration status violates the equal protection guarantees of the United States Constitution." *Compl.* ¶ 4. The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The United States Supreme Court has interpreted the word "person" within the Equal Protection Clause to include lawfully admitted resident aliens and citizens of the

United States. *Graham v. Richardson*, 403 U.S. 365, 371 (1971). Therefore, both noncitizens and citizens are entitled to "equal protection of the laws of the State in which they reside." *Id.* The Equal Protection Clause also requires that similarly situated individuals be treated alike by the laws of a state. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004).

In evaluating whether a plaintiff has presented a viable equal protection claim, the First Circuit has explained that a court must "look for two elements: (1) whether the [ ] [plaintiffs] [were] treated differently than others similarly situated, and (2) whether such a difference was based on an impermissible consideration . . ." *Macone v. Town of Wakefield*, 277 F.3d 1, 10 (1st Cir. 2002); *see Barrington Cove, LP, v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001). Once these two elements are shown, the court must determine what level of scrutiny applies to the law at issue. *See City of Cleburne*, 473 U.S. at 439-40 ("the courts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal protection").

If a state law engages in selective treatment of similarly situated individuals, the "general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440. Yet, if the statute classifies by race, alienage, national origin or impinges on fundamental rights, strict scrutiny will apply and the law will only be upheld if it is necessary to promote a compelling governmental interest. *Id.*;

15

*Bernal v. Fainter*, 467 U.S. 216, 219 (1984); *Graham*, 403 U.S. at 366-70, 375-76 (concluding "[t]he classifications involved in the instant cases [noncitizens versus citizens regarding their entitlement to state welfare benefits], on the other hand, are inherently suspect and are therefore subject to strict judicial scrutiny whether or not a fundamental right is impaired").

To determine what standard of review applies, the Court must first determine whether the state of Maine discriminated against Mr. Bruns and other Medicaid-ineligible qualified aliens compared to similarly situated individuals.

### 1.    "Similarly Situated" Individuals

In the equal protection context, "[t]he formula for determining whether individuals or entities are 'similarly situated' for equal protection purposes is not always susceptible to precise demarcation." *Barrington Cove, LP,* 246 F.3d at 8.  In *Dartmouth Review*, the First Circuit provided guidance:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands a like result.  Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples.

889 F.2d at 19.  "[A] complaint may survive a Rule 12(b)(6) motion as long as the 'similarly situated' prong of the equal protection rubric is satisfied by an allegation that the plaintiff was a member of the class . . . thereby supporting the essential implication that class members are similarly situated in all relevant respects." *Barrington Cove, LP*, 246 F.3d at 10.  Yet, "an equal protection claimant 'may not

prevail [against a Rule 12(b)(6) motion] simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus.'" *Id.* (quoting *Coyne v. Somerville*, 972 F.2d 440, 444 (1st Cir. 1992)).

Here, the parties dispute whether Mr. Bruns and his proposed class are "similarly situated" with United States citizens based upon two distinct views of the MaineCare framework.  Commissioner Mayhew claims that the State provided two separate programs for health care benefits to (1) citizens and Medicaid-eligible qualified aliens and (2) Medicaid-ineligible qualified aliens who had not lived in the United States for at least five years.  *Def.'s Mot.* at 12-16.  She argues that Mr. Bruns was not similarly situated with citizens receiving federal MaineCare benefits because he and the members of his proposed class never actually received those benefits or were in a state-funded and controlled benefit program with citizens.  *Id.* at 9.  Mr. Bruns rejects this claim asserting that there was a single program—MaineCare—which provided the same health benefits to both citizens and Medicaid-ineligible qualified aliens.  *Pl.'s Opp'n* at 7-11.

### 2.    Extrinsic Evidence and the Motion to Dismiss

The central preliminary issue is what the Court may consider in ruling on the motion to dismiss.  Mr. Bruns insists that whether there are two separate benefit programs or a unified benefit program is a factual issue unfit for resolution in a motion to dismiss.  *Pl.'s Opp'n* at 5-6.  Commissioner Mayhew characterizes the issue as one of law, pointing out the "tenet that a court must accept as true all of

the allegations contained in a complaint is inapplicable to legal conclusions." *Def.'s Mot.* at 3 (quoting *Maldonado*, 568 F.3d at 268).

On this question, the Court agrees with Mr. Bruns; whether the programs are separate or joint is a factual issue. *See Pimentel*, 670 F.3d at 1108 (suggesting the court should engage in "a careful consideration" of facts to determine whether the benefit programs are joint or separate for purposes of the Equal Protection Clause). Although there are some limitations to the principle that in ruling on a motion to dismiss, a court must restrict itself to the allegations in the complaint, the First Circuit has described this exception as "narrow." *Alternative Energy*, 267 F.3d at 33.

Assuming for the moment that the Court may consider the statutory structure of the federal and state legislation and the legislative history to determine whether it is consistent with Mr. Bruns's allegations, the question turns to whether the extrinsic evidence is so strong that it undercuts the truth of the allegations in the Complaint, disguising a legal position as a factual assertion. In the colorful words of the First Circuit, the Court is not required to accept as true "bald assertions, unsupportable conclusions, and opprobrious epithets." *Campagna,* 334 F.3d at 155. In making this assessment, the Court must draw all reasonable factual inferences in Mr. Bruns's favor in determining whether he has made a plausible case for relief. *Schatz*, 669 F.3d at 55.

### 3.    The History of Federal Medicaid in Maine

Created by Congress in 1965, Medicaid enables the federal government, through cooperative agreements with the states, to assist elderly, poor, and disabled individuals in obtaining medical care.  42 U.S.C. § 1396 *et seq*.; 42 C.F.R. § 430.0 (2002).  The federal program provides financial assistance to states that establish Medicaid programs consistent with federal law and according to state plans approved by the United States Department of Health and Human Services.   42 U.S.C. § 1396 (2000); 42 C.F.R. §§ 430.0, 430.10-.20 (2002); *see Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50, 51 (1st Cir. 2004). Thus, federal-state Medicaid programs are subject to federal approval and control.  *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004) ("State participation is voluntary; but once a State elects to join the program, it must administer a state plan that meets federal requirements").

In April 1974, Maine began providing medical assistance to the needy in conjunction with federal Medicaid.  *See* An Act Relating to Supplemental Security Income, 1973 Me. Laws 790 § 2 (stating that "[t]he department is authorized to administer programs of aid, medical or remedial care and services for medically indigent persons").  In 1996, Congress passed PRWORA significantly changing the United States welfare system and eliminating Medicaid coverage for some aliens to ensure that "the availability of public benefits [does] not constitute an incentive for immigration to the United States."  Pub. L. No. 104-193, 110 Stat 2105 (1996); 8 U.S.C. § 1601(2)(B).  The law divided aliens into two classes for Medicaid eligibility:

qualified and non-qualified aliens.  Non-qualified aliens include illegal aliens who are ineligible for Medicaid benefits.  *See* 8 U.S.C. § 1611(a).  Qualified aliens include lawful permanent residents, asylees, certain refugees, and a few other specific categories of legal noncitizens.  *Id*. § 1641(b).  The law further broke down eligibility for Medicaid benefits so that qualified aliens are only eligible to receive federal benefits if they have lived in the United States for at least five years.[3]  *Id*. § 1613(a).

To comply with federal law, the states were required to deny federal Medicaid coverage to qualified aliens who are barred from receiving benefits by the five-year rule.  *See* 42 U.S.C. § 1396; 10-144 C.M.R. ch. 332, pt. 2 § 3.4 (2012) (stating that for MaineCare "[l]egal permanent residents are not eligible for full benefits if they have been in the U.S. less than five years").  Qualified aliens unable to receive Medicaid may still receive emergency benefits necessary for the treatment of emergency medical conditions.  8 U.S.C. § 1611(b).  Also, PRWORA explicitly authorizes states to provide state-funded health benefit programs to qualified aliens subject to the five-year Medicaid residency requirement.  *Id*. § 1622(a).

In 1997, in response to PRWORA, the state of Maine enacted a state statute that granted state-funded medical care to Medicaid-ineligible qualified aliens.  *See* Temporary Assistance for Needy Families, 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B).  The Maine Legislature provided that "recipients under this subparagraph are limited to categories of noncitizens who would be eligible for TANF or Medicaid programs but for their status as aliens under PRWORA."  *Id*. §

---

[3]      Section 1613(b) carves out some exceptions to this rule and deems certain refugees and asylees as well as veterans and members of the Armed Forces on active duty as qualified immigrants eligible for federal benefits despite the five-year residency requirement.  8 U.S.C. § 1613(b).

3762(3)(B)(2).   As a result, in Maine, qualified aliens subject to the five-year Medicaid residency requirement received state-funded health benefits until 2011 when the Maine Legislature eliminated the program.   2011 Me. Laws 380, § KK-4(B)(2).

### 4.   Distinguishing MaineCare from the Former Program Administering Benefits to Medicaid-Ineligible Aliens

In Mr. Bruns's Complaint, he states that, "[a]lthough MaineCare benefits for [ ] non-citizens were exclusively state-funded while United States citizen benefits were jointly funded by the federal and state governments, this did not create an independent state Medicaid program for lawful permanent residents in Maine. Instead, full MaineCare benefits were offered to non-citizens lawfully residing in the State of Maine and citizens on the same terms through the same MaineCare program." *Compl.* ¶ 27.   There is a strong suggestion from other jurisdictions that this allegation is incorrect.

In *Pimentel*, a case dealing with an equal protection challenge to state and federal food stamp programs post-PRWORA by a class of noncitizens, the Ninth circuit stated that each health benefit programs' funding source is only one factor for determining whether the programs are joint or separate.   *Pimentel*, 670 F.3d at 1107; *see Hong Pham,* 16 A.3d at 654 (finding, after engaging in a similar factual comparison, that the federal Medicaid program and Connecticut's aliens-only health benefit program were separate in the context of an equal protection challenge brought by Medicaid-ineligible qualified aliens).   In *Pimentel*, the Ninth Circuit concluded that "[a] careful consideration of the contours" of each benefit program

21

"including the statutory scheme, source of funding, extent of state involvement, and history" helped the Court determine whether the state and federal welfare programs were separate or joint for equal protection purposes. 670 F.3d at 1107. Accordingly, augmenting the record as permitted by *Schatz* and *Haley*, the Court evaluates the statutory scheme, source of funding, extent of state involvement, and history of each program.

First, with respect to the statutory scheme, MaineCare is a joint federal and state funded program. 2001 Me. Laws 450 § C-2. Because federal funds are used to pay for part of the program, it is subject to federal control. 42 U.S.C. § 1396a (2000); 42 C.F.R. §§ 430.0, 430.10-.20 (2002). Further, MaineCare is exclusively offered to citizens and qualified aliens not subject to a five-year residency exclusion. 10-144 C.M.R. ch. 332, pt. 2 (2012). By contrast, the program Mr. Bruns and other members of his proposed class received benefits through was statutorily mandated to be funded only with state funds.[4] *See* 8 U.S.C. § 1613(a), § 1622(a); 2011 Me. Laws 380, § KK-4(B)(2). As the federal government had expressly disclaimed any obligation to provide benefits for Medicaid-ineligible qualified aliens and the state of Maine voluntarily assumed this obligation, the Maine program was state-controlled. *See* 8 U.S.C. § 1613(a), § 1622(a); 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B). Furthermore, the Maine Legislature expressly limited assistance under the state

---

[4]     Ms. Mayhew admits that "[a] Department administrative error led to some amount of federal money being applied to Maine's state medical assistance benefits for Medicaid-ineligible aliens. Such errors are subject to a financial reconciliation process between the Department and the U.S. Department of Health and Human Services." *Def.'s Mot.* at 7 n.4. The Court does not find that this error changes the substance of the program because by statute it was not supposed to be funded with federal dollars.

program for Medicaid-ineligible qualified aliens to "categories of noncitizens who would be eligible . . . for Medicaid programs but for their status as aliens under PRWORA." 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B). This text underscores the Maine Legislature's intent that the program exclusively benefit Medicaid-ineligible qualified aliens.

Mr. Bruns insists the Court should find the two programs are unified because Maine DHHS referred to them interchangeably as MaineCare.[5] *Pl.'s Opp'n* at 7-11. Furthermore, he argues that "non-citizens entered the program by filling out the exact same MaineCare application; their eligibility was determined pursuant to the exact same guidelines; and they received the exact same MaineCare cards that entitled them to receive the exact same MaineCare benefits." *Id.* at 1. The Court wonders about whether Mr. Bruns will be able to support his claim. In *Pimentel*, the Ninth Circuit faced similar circumstances when a state of Washington agency used the same application form for citizens and noncitizens with respect to its federal and state food programs and never informed applicants which program applied to their receipt of benefits. 670 F.3d at 1101-02. The *Pimentel* Court concluded: "although the district court found that DHHS effectively operated SNAP [the State's aliens-only program] and FAP [the federal program] benefits under one unified program . . . the appearance of a single program does not overcome this fact: the two programs are, in reality, two separately administered programs funded by two distinct sovereigns." *Id.* at 1107.

---

[5]     In her Motion to Dismiss, Commissioner Mayhew stated, "what the plaintiff received were state medical assistance benefits that were, admittedly, often inaccurately referred to as 'MaineCare' benefits by the Department and others." *Def.'s Mot.* at 13.

From the Court's perspective, it is difficult to conclude that the use or misuse of the name, MaineCare, should control the substance of the two programs. The programs' substantive differences include their funding structures, histories, and sources of control. *Id.* at 1101 (discussing SNAP versus FAP benefits); *Pham*, 16 A.3d at 641-42 (comparing the SMANC and SAGA programs).

Next, the source of each program's funding and the level of state involvement appears to differ with each program. MaineCare is funded jointly by the state and federal governments whereas the state health program for Medicaid-ineligible aliens statutorily was paid for only with state funds. 42 U.S.C. § 1396a (2000); 8 U.S.C. § 1622(a); *see Pimentel*, 670 F.3d at 1108 ("[although] states provide fifty percent of the administrative costs to the SNAP program, this still does not register Washington State anything more than an arm of the U.S. Department of Agriculture, distributing SNAP benefits under a federal program"). It does not matter that Commissioner Mayhew has admitted that Maine erroneously used some federal funds to pay for state medical benefits to Medicaid-ineligible aliens. Maine's use of those funds contravened PRWORA, which expressly prohibited federal payment for health benefits to Medicaid-ineligible qualified aliens. Legally, the State undertook the obligation to pay for any benefits it provided Medicaid-ineligible aliens and therefore the funding structure for each program was fundamentally separate.

Similarly, given the programs' separate funding structures, the extent of each government's involvement with the programs seems to differ. The federal and state

of Maine governments share control over MaineCare whereas Maine exclusively controlled its program providing benefits to Medicaid-ineligible aliens. 42 U.S.C. § 1396a; 8 U.S.C. § 1613(a); 8 U.S.C. § 1622(a); 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B). For example, 42 U.S.C. § 1396a sets out a long list of requirements that states administering partially federal-funded Medicaid programs must comply with to continue receiving federal funds. 42 U.S.C. § 1396a. The State did not have these same requirements with its alien-only program. *See* 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B).

Finally, the history of the programs indicates their fundamental differences. The state of Maine established its Medicaid system in 1973 as a joint venture with the federal government. 1973 Me. Laws 790. The federal and state governments continue to provide benefits to citizens and certain qualified aliens through MaineCare. In 1997, Maine, without assistance from the federal government, formed the state-funded program that provided Mr. Bruns with medical benefits until 2011. 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B); 2011 Me. Laws 380, § KK-4(B)(2). But for the elimination of coverage for qualified aliens because of PRWORA, there is no indication that the Maine Legislature would have passed a separate state-funded medical benefit program.

Applying *Pimentel*'s analysis to clarify whether the federal and state programs are truly separate or unified, a comparison of their statutory history and provisions strongly suggests that MaineCare is a separate and distinct program from Maine's former medical benefit program for Medicaid-ineligible aliens.

25

### 5.    The Restrictive Nature of a Motion to Dismiss

In short, the applicable statutes powerfully suggest that Mr. Bruns's allegation that he benefitted from the same state of Maine program that benefitted United States citizens in Maine is factually incorrect.  However, because of the procedural mechanism under which it is laboring, namely a motion to dismiss, it is clear that the Court must not assume the role of a fact-finder.  It is sometimes difficult to draw a bright  line between legal conclusions and factual allegations and between "bald assertions," *Campagna,* 334 F.3d at 155, and good faith allegations subject to proof.  This is one of those cases.  Here, despite some misgivings, the Court concludes that the line between factual allegation and legal conclusion is too murky for a clean and decisive resolution.

Furthermore, although *Pimentel* and *Hong Pham* are persuasive and suggest that Mr. Bruns will ultimately be unsuccessful, neither was decided on a motion to dismiss.   *Pimentel*, 670 F.3d at 1111 (reversing the granting of a motion for preliminary injunction); *Hong Pham,* 16 A.3d at 654 (addressing a trial court order granting a motion for preliminary injunction).  In sum, the Court is chary about issuing a ruling that could later be attacked as bottomed on disputed and prohibited factual findings.  From the Court's perspective, it is preferable to allow the parties to present the Court with a different vehicle for the resolution of this case, one that would provide the Court with a stipulated set of facts or allow findings on a narrow range of disputed facts.[6]

---

[6]    The Court is aware of Mr. Bruns's motions for preliminary injunction and class certification and will schedule a telephone conference regarding further action on these motions.

**IV.   CONCLUSION**

The Court DISMISSES without prejudice Commissioner Mary Mayhew's Motion to Dismiss the Class Action Complaint (ECF No. 12).


SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 20th day of November, 2012