UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| HANS BRUNS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:12-cv-00131-JAW |
| | ) | |
| MARY MAYHEW, Commissioner, | ) | |
| Maine Department of Health and | ) | |
| Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON THE PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

In 1997, the state of Maine elected to cover noncitizens under its state
Medicaid program and it continued to do so until June 2011, when the Maine
Legislature passed Public Law 2011, chapter 380, section KK-4, terminating
Medicaid-ineligible alien health benefit coverage.  Noncitizens Hans Bruns and
Kadra Hassan, on behalf of themselves and a proposed class of Maine residents,
request that the Court declare Public Law 2011, chapter 380, section KK-4
unconstitutional and grant a preliminary injunction enjoining Mary Mayhew, the
Commissioner of the Maine Department of Health and Human Services (DHHS),
from enforcing the law.  They also petition the Court to order the restoration of
their MaineCare benefits.  The Plaintiffs claim that the 2011 Maine law violates the
Equal Protection Clause of the Fourteenth Amendment of the United States
Constitution because it discriminates against noncitizens in favor of citizens in the

administration of MaineCare benefits.  After an analysis of the four preliminary injunction factors, the Court denies the Plaintiffs' motion because they are unable to establish a likelihood of success on the merits of their equal protection claim.

## I.   BACKGROUND

### A.   Procedural Background

On April 4, 2012, Hans Bruns filed a class action complaint against Mary Mayhew in her official capacity as the Commissioner of Maine DHHS.  *Class Action Compl. for Declaratory and Inj. Relief* (ECF No. 1) (*Compl.*).  The Complaint was amended on December 7, 2012 to join an additional Plaintiff, Kadra Hassan, in the action.  *First Am. Class Action Compl. for Declaratory and Inj. Relief* (ECF No. 25) (*First Am. Compl.*).  On April 4, 2012, the Plaintiffs moved for class certification, *Pls.' Mot. for Class Certification* (ECF No. 4), and for a preliminary injunction, *Pls.' Mot. for Prelim. Inj.* (ECF No. 5) (*Pls.' Mot.*).  The Commissioner moved to dismiss the Plaintiffs' initial Complaint pursuant to Rule 12(b)(6) on May 11, 2012, *Def.'s Mot. to Dismiss* (ECF No. 12), and opposed the Plaintiffs' motions for class certification and preliminary injunction.  *Def.'s Opp'n to Pls.' Mot. for Class Certification* (ECF No. 14); *Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj.* (ECF No. 13) (*Def.'s Opp'n*).

On May 25, 2012, the Plaintiffs filed their opposition to the Commissioner's motion to dismiss.  *Pls.' Opp'n to Def.'s Mot. to Dismiss* (ECF No. 17) (*Pls.' Opp'n*).  They also replied to the Commissioner's opposition to the motions for class certification and preliminary injunction.  *Pls.' Reply Mem. in Supp. of Class*

*Certification* (ECF No. 15); *Pls.' Reply Mem. in Supp. of Prelim. Inj.* (ECF No. 16) (*Pls.' Reply*).   On November 20, 2012, the Court dismissed the Commissioner's motion to dismiss without prejudice.   *Order on Commissioner's Mot. to Dismiss* (ECF. No. 19) (*Order*).   On December 19, 2012, the Commissioner filed an Answer to the First Amended Complaint.   *Def.'s Ans. to First Am. Compl.* (ECF No. 27) (*Def.'s Ans.*).

> **B.   The Allegations**

> > **1.   Federal Medicaid and MaineCare Frameworks**

Medicaid is a jointly funded state and federal program that provides medical assistance to low-income individuals.   *First Am. Compl.* ¶ 26.   In 1973, the Maine Legislature enacted Aid to Needy Persons, Public Law 1973, chapter 790, codifying its decision to provide Medicaid coverage to all qualified individuals regardless of their immigration status and alienage.   *Id.*   The state of Maine's Medicaid program is called MaineCare and Maine DHHS is responsible for administering MaineCare to Maine residents.   *Id.*

In 1996, Congress changed the eligibility requirements for federal Medicaid with its enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Public Law No. 104-193, 110 Stat. 2105 (1996).   *Id.* ¶ 27.   PRWORA divided noncitizens into two groups for Medicaid eligibility: qualified and non-qualified aliens.   *Id.*   Qualified aliens include lawful permanent residents and certain other specified groups of individuals, such as asylees and refugees.   *Id.*

The Act further divided qualified aliens into two groups for Medicaid eligibility based upon the length of an alien's residency in the United States. *Id.* The law generally made Medicaid benefits unavailable to qualified aliens residing in the United States after August 22, 1996 until the aliens had resided in the United States for at least five years with qualifying status. *Id.* Nevertheless, the law provided that these Medicaid-ineligible noncitizens could receive medical assistance required to treat emergency medical conditions. *Id.* ¶ 28.

PRWORA also authorized states to decide whether to provide health benefit services to Medicaid-ineligible noncitizens residing within their borders. *Id.* ¶ 29. In response, in 1997, the Maine Legislature voted unanimously to pass Temporary Assistance to Needy Families (TANF), Public Law 1997, chapter 530, section A-16, which provided state-funded health benefit coverage to all legal noncitizens "'who would be eligible for the TANF or Medicaid programs but for their status as aliens under PRWORA.'" *Id.* ¶ 30. However, in June 2011, the Maine Legislature passed Public Law 2011, chapter 380, section KK-4, which terminated Medicaid-ineligible aliens' health benefit coverage under the 1997 law. *Id.* ¶ 31. Maine DHHS implemented this new law through emergency rulemaking on September 1, 2011 and adopted it permanently as of December 5, 2011. *Id.*

### 2. Hans Bruns

Hans Bruns resides in Fort Fairfield, Maine. *Id.* ¶ 10. Mr. Bruns became a United States lawful permanent resident on December 16, 2007. *Id.* ¶ 10, 32. He is indigent and, because of his low income, cannot afford to pay for private health

4

insurance.  *Id.* ¶ 32.  Sometime in December 2010, Mr. Bruns began to receive health insurance benefits through the state of Maine.  *Id.*  On September 1, 2011, DHHS sent form termination notices to approximately five hundred noncitizens living in Maine, including Mr. Bruns, informing them that their state-funded coverage was being reduced to emergency care only.  *Id.* ¶ 4.  The State terminated Mr. Bruns' benefits on October 1, 2011.  *Id.* ¶ 34.

After experiencing pain on the right side of his face for more than a year and seeking treatment for a mass on the right side of his neck, Mr. Bruns was diagnosed in late 2011 or early 2012 with adenoid cystic carcinoma of the right parotid gland and an apparent lesion in his lung.  *Id.* ¶¶ 11, 33.  Mr. Bruns has experienced extreme pain and suffering, which has impacted his ability to sleep, hear, and swallow because of the large cancerous tumor in his neck.  *Id.* ¶ 1.

Without full MaineCare benefits, Mr. Bruns has been unable to afford medical care required to cure his condition, which includes services such as MRI imaging, resection of the lesion, radiation, and chemotherapy.  *Id.* ¶¶ 1, 11 35.  Emergency care benefits under the State's current MaineCare program could not provide Mr. Bruns with the necessary medical services to treat his condition.  *Id.* ¶ 10.  Because Mr. Bruns did not receive a timely diagnosis and treatment for his cancer, he is now terminally ill and receiving hospice care.  *Id.* ¶ 1.

### 3.  Kadra Hassan

Ms. Hassan was admitted to the United States as a non-immigrant on December 25, 2010 and is awaiting a decision on her asylum application.  *Id.* ¶ 36.

She has lived in Maine for several years and currently resides in Lewiston. *Id.* ¶ 12. Ms. Hassan suffers from Stage 5 Kidney Disease (End Stage Renal Disease) and requires kidney dialysis several times per week, prescription medications, and regular primary care physician visits, among other things. *Id.* ¶¶ 13, 36. Ms. Hassan goes to kidney dialysis treatment several times a week. *Id.* ¶ 2. Like Mr. Bruns, Ms. Hassan also requires medical care and treatment but cannot afford to pay for that care without state subsidy. *Id.* ¶ 36.

In January of 2012, Ms. Hassan applied and was found eligible for MaineCare benefits but was limited to emergency-only MaineCare benefits by Maine DHHS due to her immigration status. *Id.* ¶ 37. Without treatment, particularly dialysis and a kidney transplant, Ms. Hassan's condition will ultimately result in her death. *Id.* ¶ 36. Although she has been recommended for a kidney transplant, Ms. Hassan was turned down for the operation because of her lack of health insurance coverage. *Id.* ¶ 13.

## II. THE PARTIES' POSITIONS

### A. The Plaintiffs' Motion

The Plaintiffs claim they satisfy the first factor of the preliminary injunction inquiry because the "State of Maine . . . plainly created a classification based upon alienage that cannot survive strict scrutiny." *Pls.' Mot.* at 5. They contend that Maine DHHS violated the Equal Protection Clause because the 2011 law created "two classes of MaineCare recipients" based on the recipients' immigration status and because "citizens and noncitizens in Maine were always part of, and granted

the same benefits by, one MaineCare program."  *Id.* at 7, 9.  Given that the Commissioner cannot proffer a compelling state interest to justify the 2011 law, the Plaintiffs are confident they can demonstrate a likelihood of success on the merits. *Id.* at 13.

With respect to the second factor, the potential for irreparable harm, the Plaintiffs cite First Circuit caselaw supporting their argument that the Commissioner's wrongful denial of Medicaid benefits, which causes individuals like the Plaintiffs to forgo necessary medical treatment, is irreparable injury.  *Id.* at 14. They point out that the Plaintiffs' have "already suffered harm, and will continue to do so until the Defendant is required to provide [them] with benefits." *Id.* at 15.

Regarding the third factor, the Plaintiffs assert that the hardship they will suffer absent health care support from the State outweighs the financial hardship the Defendant will face if the Court grants their motion.  *Id.* at 16.  Specifically, the Plaintiffs assert that the cost savings as a result of limiting coverage to some qualified aliens saved the State only 0.1932% of the General Fund MaineCare Budget for fiscal year 2012.  *Id.*  They argue that, "[t]his relatively small cost savings cannot outweigh the significant and irreparable harm to the Plaintiffs." *Id.*

Finally, regarding the fourth factor, the Plaintiffs insist that the public interest favors granting the preliminary injunction because "[i]t is unimaginable how seeking to prevent a State government's infringement upon the right to equal protection would disserve the public interest" especially considering the facts in this case.  *Id.* at 16.  On a procedural note, the Plaintiffs ask the Court to waive the Rule

56(c) security requirement because the Plaintiffs are indigent, this case involves an important "public interest", and they have demonstrated a strong likelihood of success on the merits. *Id.* at 17.

### B.  The Commissioner's Opposition

First, the Commissioner maintains that "[a] showing of likelihood of success on the merits stands as the sine qua non for obtaining preliminary injunctive relief . . . a burden that the plaintiff[s] cannot carry." *Def.'s Opp'n* at 1.  She claims that there was no Equal Protection Clause violation because the elimination of a state program which serves only aliens does not constitute selective treatment. *Id.* at 1, 7.  Regarding the second preliminary injunction factor, the Commissioner asserts that the Plaintiffs do not necessarily face irreparable harm because they may be eligible for MaineCare's emergency care or medically necessary inpatient and outpatient hospital care pursuant to Maine's Free Care law. *Id.* at 8.

Next, the Commissioner argues that the balance of burdens weighs in the State's favor because if the Court grants the preliminary injunction it would shift the Plaintiffs' cost of care from hospitals to the State. *Id.* at 9.  With respect to the fourth factor, the Commissioner contends that the public interest in managing and containing the current budgetary crisis controls the analysis. *Id.*  Finally, the Commissioner asserts that the goal of preliminary injunctions—to preserve the status quo—is not furthered by granting a preliminary injunction in this case because Maine's termination of state-funded medical benefits to Medicaid-ineligible qualified aliens in 2011 fundamentally changed the status quo. *Id.*

C.      **The Plaintiffs' Reply**

In response, the Plaintiffs argue that the 2011 Maine law violates the Equal Protection Clause because there was never a "creation of a non-citizen-only program or non-citizen-only benefit."  *Pls.' Reply* at 1-2.  Regarding the second factor, the Plaintiffs argue that the Commissioner "overestimates the scope of the alternative care options" because emergency care is extremely limited and explicitly excludes care the Plaintiffs require in order to avoid irreparable injury such as "dialysis, organ transplants, school based services, personal care services, waiver services, nursing facility services and hospice services." *Id*. at 4.  They also argue that medically necessary care under Maine's Free Care law fails to remedy the Plaintiffs' potential harm because it only provides care for inpatient and outpatient hospital services and would disqualify a large number of individuals from receiving services given the program's income requirements.  *Id*. at 5.

Here, because the indigent Plaintiffs would be responsible to either pay out-of-pocket for their healthcare or forego treatment, they insist that the potential for irreparable injury is undeniable.  *Id*. at 6.  Further, they note that "[i]t is not only disappointing but appalling that the Defendant argues that a minuscule cost savings . . . outweighs at least 500 Maine residents' need to access necessary medical care."  *Id*. at 6-7.  Accordingly, the Plaintiffs contend that both the third and fourth factors, the balance of hardships and public interest, weigh in their favor.  *Id*.  Finally, the Plaintiffs urge the Court to disregard the Commissioner's "status quo" argument because motions for preliminary injunction "'alter[] rather

than preserve[] the status quo.'" *Id.* at 6 (quoting *Braintree Labs., Inc. v. Citigroup Global Mkts.*, 622 F.3d 36, 41 (1st Cir. 2010)).

## III.   DISCUSSION

### A.   Legal Standard

"'A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right.'" *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc., v. MDTV Med. Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).   When deciding whether to grant the Plaintiffs' motion for preliminary injunction, the Court must carefully weigh four factors.   *Esso Std. Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006). These factors include:   "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant]; (3) the balance of the relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.*" Id.* (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Id.*  However, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."   *New Comm Wireless Servs., Inc., SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir. 2002); *see Sindicato Puertorriqueno de*

*Trabajadores v. Foruno*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that "this factor is the most important part of the preliminary injunction assessment") (internal citations omitted). Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of [preliminary injunctive] relief." *Sanchez v. Esso Std. Oil Co.*, 572 F.3d 1, 4 (1st Cir. 2009).

### B.   The Plaintiffs' Motion for Preliminary Injunction

#### 1.   Likelihood of Success on the Merits

Here, because the Plaintiffs cannot satisfy the threshold requirements for their Equal Protection Clause claim, they have not demonstrated the sine qua non of the preliminary injunction test—a likelihood of success on the merits. *See New Comm Wireless Servs., Inc.*, 287 F.3d at 9*; see Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006) ("the cynosure of this four-part test is more often than not the movant's likelihood of success on the merits"). The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Because "person" denotes lawfully admitted resident aliens and citizens of the United States, both noncitizens and citizens are entitled to "equal protection of the laws of the State in which they reside." *Graham v. Richardson*, 403 U.S. 365, 371 (1971). Equal protection of the laws necessarily requires that similarly situated individuals be treated alike by the laws of a state. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004).

To evaluate whether an equal protection claim is viable, the First Circuit has explained that a court must "look for two elements: (1) whether the [ ] [plaintiffs] [were] treated differently than others similarly situated, and (2) whether such a difference was based on an impermissible consideration . . . ." *Macone v. Town of Wakefield*, 277 F.3d 1, 10 (1st Cir. 2002); *see Barrington Cove, LP, v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001).  Once these two elements are shown, the court must determine what level of scrutiny applies to the law at issue. *See City of Cleburne*, 473 U.S. at 439-40.

"The formula for determining whether individuals or entities are 'similarly situated' for equal protection purposes is not always susceptible to precise demarcation." *Barrington Cove, LP,* 246 F.3d at 8.  In *Dartmouth Review*, the First Circuit set out the prudent person test:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands a like result.  Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples.

889 F.2d at 19.

Here, the parties fundamentally disagree about the statutory structure of the state of Maine's medical benefit program for Medicaid-ineligible qualified aliens post-PRWORA.  The Plaintiffs insist that Medicaid-ineligible qualified aliens received benefits through MaineCare—"a single program providing medical benefits to both citizens and noncitizens alike." *Pls.' Mot*. at 8.  They argue, "[the] creation

12

of two classes of individuals within a medical benefits program like MaineCare is a classification based upon alienage." *Id.* The Commissioner disputes this interpretation of MaineCare and claims that the State created two distinct medical benefit programs: (1) MaineCare for citizens and Medicaid-eligible qualified aliens and (2) a separate state-funded program for Medicaid-ineligible qualified aliens subject to the five-year residency requirement.[1] *Def.'s Mot. to Dismiss* at 12-16 (ECF No. 12). Because the Plaintiffs were not "as a matter of law, deprived of a benefit to which citizens remain entitled", the Commissioner urges the Court to deny their motion. *Def.'s Opp'n* at 7. The First Circuit has not confronted this exact legal issue; however, other federal and state courts have examined the validity of state termination of state-funded benefits post-PRWORA in lawsuits concerning the denial of medical and food stamp benefits.

> a.   **The Elimination of a State's Aliens-only Welfare Program Does Not Violate the Equal Protection Clause**

Several federal and state courts have concluded that a state's elimination of a state-created and state-funded benefit program for noncitizens ineligible for federal benefits does not violate the Equal Protection Clause. First, in *Pimentel v. Dreyfus*, 670 F.3d 1096 (9th Cir. 2012), the Ninth Circuit addressed a similar case. In 1997, the state of Washington Legislature enacted the Food Assistance Program for Legal Immigrants ("FAP") in response to PRWORA, to provide food benefits to noncitizens ineligible for the federal-state food benefit program ("SNAP"). *Id.* at 1101. When

---

[1]   The Commissioner incorporates the arguments she made in her motion to dismiss into her opposition to the Plaintiffs' motion for preliminary injunction. *See Def.'s Opp'n* at 7.

the state of Washington eliminated the FAP program in 2011, Monica Navarro Pimentel, a noncitizen, faced termination from FAP and pursued a class action lawsuit against the State alleging that by terminating food benefits for noncitizens, the State violated the Equal Protection Clause.  *Id.* at 1101-02.  The Ninth Circuit concluded that the district court improperly granted a preliminary injunction for the plaintiff and her class because they failed to show that State treated the ineligible noncitizens differently from similarly situated individuals.  *Id.* at 1106. In forming this conclusion, the Court stressed that citizens and the plaintiff class members—qualified aliens ineligible for federal food benefits until they met PRWORA's residency requirement—were receiving benefits from two separate programs: one sponsored and controlled by the federal and state governments; the other exclusively state sponsored and controlled.  *Id.* at 1107-08.  Based on this distinction, the Court held the plaintiffs were not "similarly situated" with citizens receiving SNAP benefits.  *Id.*

When determining whether the federal-state food benefit program, SNAP, was distinct from the state food program, FAP, the *Pimentel* Court engaged in "[a] careful consideration of the contours of the SNAP program, including the statutory scheme, source of funding, extent of state involvement, and history, [which] demonstrate[d] that SNAP is a federal program which the state merely assists in administering, rather than a state program which receives federal assistance."  *Id.* at 1107.  Given this analysis, the Ninth Circuit concluded that SNAP's beneficiaries were not similarly situated with the plaintiffs.  *Id.*  The Court also rejected the

district court's finding that the programs were the same given that they offered food benefits out of what appeared to be a unified program because "[t]he appearance of a single program does not overcome this fact: the two programs are, in reality, two separately administered programs funded by two distinct sovereigns." *Id.*

Next, in *Soskin v. Reinertson*, 353 F.3d 1242 (10th Cir. 2004), the Tenth Circuit reviewed the constitutionality of a Colorado statute that eliminated medical coverage for Medicaid-ineligible qualified aliens after PRWORA. *Id.* at 1246-47. The *Soskin* Court concluded that "[w]hat Congress has done in PRWORA is, in essence, create two welfare programs, one for citizens and one for aliens. Within the aliens-only program, states have the option of including more or fewer aliens." *Id.* at 1255. The Court also found that "[a] state's exercise of the option to include fewer aliens in its aliens-only program, then, should not be treated as discrimination against aliens as compared to citizens." *Id.* at 1255-56. Ultimately, the Tenth Circuit affirmed the district court's denial of the plaintiffs' motion for a preliminary injunction because the plaintiffs likely would not prevail on their equal protection challenge. *Id.* at 1264-65.

In *Hong Pham v. Strakowski*, 16 A.3d 635 (Conn. 2011), the Supreme Court of Connecticut reviewed a similar case where the Connecticut Legislature enacted a post-PRWORA state-funded program to provide health benefits for Medicaid-ineligible qualified aliens. *Id.* at 641-42. The *Hong Pham* Court concluded that the case involved two separate benefit programs and that "a state does not discriminate against aliens when it treats aliens covered under an alien-only benefit program

15

differently from the way in which citizens and other aliens are treated under separate, federal-state benefit programs." *Id.* at 647, 654. The Connecticut Supreme Court reversed the trial court's permanent injunction because it concluded that there was no equal protection violation. *Id.* at 637, 664.

Finally, in *Doe v. Commissioner of Transitional Assistance*, 773 N.E.2d 404 (Mass. 2002), the Supreme Judicial Court of Massachusetts, addressing a similar case, affirmed the Superior Court's denial of the plaintiffs' motion for preliminary injunction because there was no equal protection violation. *Id.* at 408. The plaintiffs claimed that the Commonwealth's six-month residency requirement to qualify for its supplemental health benefit program for Medicaid-ineligible aliens violated their rights under the Equal Protection Clause because citizens were not subject to the same residency requirement. *Id.* at 407-08. The *Doe* Court held that because the benefit program for Medicaid-ineligible aliens was separate from the federal-state funded program for citizens, the program was constitutional as it only "discriminate[d] between groups of qualified aliens on the basis of the length of their residency in Massachusetts." *Id.* at 411.

> **b.** **The Elimination of a State's Welfare Program Available to Both Citizens and Aliens Violates the Equal Protection Clause**

A few courts have found that states violate the Equal Protection Clause when they eliminate state-sponsored health benefit coverage for Medicaid-ineligible aliens while still allowing citizens to retain that coverage. In *Aliessa v. Novello*, 754 N.E.2d 1085 (N.Y. 2001), the plaintiffs challenged the state of New York's decision

to change its state health benefit program to comport with federal Medicaid standards and thereby impose a five-year waiting period for Medicaid-ineligible qualified aliens. *Id.* at 1089-90, 1092. According to the New York Court of Appeals, in 1966 New York created its own Medicaid system which has "two components: one that is federally subsidized and one that the State funds entirely on its own . . . New York had long provided State Medicaid to needy recipients without distinguishing between legal aliens and citizens." *Id.* at 1089-90. Yet, in light of PRWORA, where Congress distinguished between qualified aliens and citizens for federal Medicaid coverage, New York terminated all its previous Medicaid coverage for Medicaid-ineligible qualified aliens and imposed a five-year waiting period for those noncitizens before they could receive benefits from the State's own Medicaid program.[2] *Id.* at 1092.

Without addressing whether plaintiffs were "similarly situated" with citizens for equal protection purposes, the *Aliessa* Court concluded that the State violated the Equal Protection Clause when it "impermissibly imposed" a waiting period on qualified aliens' receipt of state Medicaid while still providing citizens with benefits under the State's uniform program. *Id.* at 1094-95, 1098-99. The New York Court of Appeals analyzed the offending law under strict scrutiny because it determined the law drew lines on the basis of alienage. *Id.* at 1097-98.

Notably in *Khrapunskiy v. Doar*, 909 N.E.2d 70 (N.Y. 2009), the New York Court of Appeals distinguished its facts from *Aliessa* because it involved a

---

[2]    The law permitted Medicaid-ineligible aliens to continue their state Medicaid coverage only if they previously received Medicaid and were either diagnosed with AIDS or residing in certain licensed residential health care facilities as of August 4, 1997. *Id.* at 1092, 1098.

17

comparison between the treatment of aliens under a state-funded and state-controlled health benefit program and the treatment of citizens under a similar federal-state program. *Id.* at 76-77. For the same reasons discussed in *Pimentel*, *Soskin*, *Hong Pham*, and *Doe*, the *Khrapunskiy* Court found that there was no equal protection violation when the State eliminated the aliens-only program. *Id.* at 76-77; *see also Doe*, 773 N.E.2d at 411 (distinguishing *Aliessa* because that case presented the Court of Appeals with "the very paradigm so definitively addressed in *Graham*, [ ] a State-funded benefit program available to citizens but not available to aliens on the same terms"); *Hong Pham*, 16 A.3d at 656 ("*Aliessa* involved a claim of discrimination within a [ ] state funded and state controlled public assistance program and did not involve a comparison of the treatment of aliens under one program to the treatment of citizens under a separate federal-state program").

In *Korab v. Koller*, No. 10-00483 JMS/KSC, 2010 U.S. Dist. LEXIS 119855 (D. Haw. Nov. 10, 2010) (*Korab I*), the plaintiffs challenged a Hawaii law passed in response to PRWORA, which ended the plaintiffs' eligibility for certain state health benefit programs ("old programs"). *Id.* at *36, 40. The old programs provided medical assistance to both noncitizens and citizens. *Id.* In 2010, Hawaii carved out a new state-funded program for Medicaid-ineligible aliens that provided them with less medical coverage than other aliens and citizens. *Id.* at *7-8. The *Korab I* court observed:

> For the last fourteen years, Defendants have treated COFA Residents [aliens from Compacts of Free Association countries with the United States] the same as citizens and other qualified aliens by allowing them access to the same programs, with the only difference being that

> COFA Residents participation was funded through State dollars only.
> It is only now that Defendants have decided to single out COFA
> Residents for lesser benefits than are provided to citizens and other
> classes of aliens.

*Id.* at *21.   Applying strict scrutiny to the Hawaii law, the Court denied the

defendant's motion to dismiss because the plaintiffs were able to state a viable

equal protection claim.  *Id.* at *5-9.

Later in *Korab v. Mcmanaman*, 805 F. Supp. 2d 1027 (D. Haw. 2011) (*Korab

II*), the district court, addressing a new set of motions on the same facts but for a

separate group of plaintiffs, denied the defendant's motion for summary judgment.

*Id.* at 1030, 1038.   The *Korab II* court considered *Hong Pham* in evaluating

defendant's argument against plaintiffs' equal protection claim but rejected its

premise because "by limiting the inquiry to a particular program on its own as

opposed to a state's provision of medical benefits to its residents through various

programs generally, *Hong Pham* . . . stands the Equal Protection clause on its

head."[3]  *Id.* at 1036.   Notably, the *Korab II* court distinguished the facts in its case

from *Hong Pham*: "*Hong Pham* addressed Connecticut's termination of a state

program that was available to aliens only.   In comparison, the State allowed both

Medicaid-eligible residents as well as COFA Residents to participate in the Old

Programs - - there was no separate program for COFA Residents."  *Id.* at 1037 n.7.

Finally, in *Fitch v. Commonwealth Health Insurance Connector Authority,*

959 N.E.2d 970 (Mass. 2012), the Supreme Judicial Court of Massachusetts

---

[3]        In *Pimentel*, decided after *Korab I* and *II*, the Ninth Circuit engaged in the exact analysis the
*Korab II* district court advised against when it compared two distinct medical benefit programs
against one another.  670 F.3d at 1106-08.

concluded that the Commonwealth violated noncitizens' rights under the Equal Protection Clause when it maintained a uniform program granting medical benefits to both citizens and Medicaid-ineligible qualified aliens until 2009 and then eliminated those benefits exclusively for Medicaid-ineligible aliens. *Id.* at 974-75; *cf. Pimentel*, 670 F.3d at 1108 n.13 ("[T]he *Finch* court carefully tethered its analysis to the particular statutory design of Commonwealth Care - - a single program distributing a single benefit to eligible individuals . . . [h]ere, we have not a single unified program but two distinct ones").

Only one case suggests that where a state creates two separate programs for Medcaid-eligible and ineligible aliens and citizen populations, the state violates the Equal Protection Clause by eliminating the separate aliens-only program. In *Ehrlich v. Perez*, 908 A.2d 1220 (Md. 2006), the Maryland Court of Appeals affirmed the trial court's grant of a preliminary injunction to plaintiffs who challenged Maryland's elimination of an alien-only health benefit program. *Id.* at 1223, 1247. Similar to *Pimentel*, *Pham*, and *Doe*, the state of Maryland maintained two health benefit programs: a federal-state funded program for citizens and Medicaid-eligible aliens and a post-PRWORA state funded program for Medicaid-ineligible aliens. *Id.* at 1226-27. The *Ehrlich* Court did not discuss a "similarly situated" equal protection finding or the significance of Maryland's separate programs for citizens and Medicaid-ineligible aliens presumably because the defendant did not raise that issue on appeal. *See id.* at 1230-32. Like the Courts in *Pimentel* and *Pham*, this

Court does not find *Ehrlich* persuasive.  *Pimentel*, 670 F.3d at 1107 n.12; *Hong Pham*, 16 A.3d at 652-53.

### c.    Medicaid in Maine

To assess whether the programs in this case were separate or part of the same statutory scheme, the Court examines their history.  Created by Congress in 1965, Medicaid enables the federal government, through cooperative agreements with the states, to assist elderly, poor, and disabled individuals to obtain medical care.  42 U.S.C. § 1396 (2000); 42 C.F.R. § 430.0 (2002).  The federal program provides financial assistance to states that establish Medicaid programs consistent with federal law and according to state plans approved by the United States Department of Health and Human Services.  42 U.S.C. § 1396 (2000); 42 C.F.R. §§ 430.0, 430.10-.20 (2002); *see Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50, 51 (1st Cir. 2004).  Thus, federal-state Medicaid programs are subject to federal approval and control.  *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004) ("State participation is voluntary; but once a State elects to join the program, it must administer a state plan that meets federal requirements").

In April 1974, the state of Maine began providing medical assistance to the needy in conjunction with federal Medicaid.  *See An Act Relating to Supplemental Security Income*, 1973 Me. Laws 790 § 2 (stating that "[t]he department is authorized to administer programs of aid, medical or remedial care and services for medically indigent persons").  In 1996, Congress passed PRWORA which significantly changed the United States welfare system and eliminated Medicaid

coverage for some aliens to ensure that "the availability of public benefits [does] not constitute an incentive for immigration to the United States." Pub. L. No. 104-193, 110 Stat 2105 (1996); 8 U.S.C. § 1601(2)(B). The law divided aliens into two classes for Medicaid eligibility: qualified and non-qualified aliens. Non-qualified aliens include illegal aliens who are ineligible for Medicaid benefits. *See* 8 U.S.C. § 1611(a). Qualified aliens include lawful permanent residents, asylees, certain refugees, and a few other specific categories of legal noncitizens. *Id.* § 1641(b). The law further broke down eligibility for Medicaid benefits so that qualified aliens are only eligible to receive federal benefits if they have lived in the United States for at least five years.[4] *Id.* § 1613(a) ("[A]n alien who is a qualified alien [ ] and who enters the United States on or after [August 22, 1996] is not eligible for any Federal means-tested public benefit for a period of 5 years beginning on the date of the alien's entry into the United States").

In compliance with federal law, states are required to deny federal Medicaid coverage to qualified aliens who are subject to the five-year benefit bar. *See* 42 U.S.C. § 1396; 10-144 C.M.R. ch. 332, pt. 2 § 3.4 (2012) (stating that for MaineCare "[l]egal permanent residents are not eligible for full benefits if they have been in the U.S. less than five years"). Qualified aliens unable to receive Medicaid may still receive benefits necessary for the treatment of emergency medical conditions. 8 U.S.C. § 1611(b). Nevertheless, PRWORA explicitly authorizes states to provide

---

[4] Section 1613(b) carves out some exceptions to this rule and deems certain refugees and asylees as well as veterans and members of the Armed Forces on active duty as qualified immigrants eligible for federal benefits despite the five-year residency requirement. 8 U.S.C. § 1613(b).

state-funded health benefit programs to qualified aliens subject to the five-year Medicaid residency requirement. *Id.* § 1622(a).

In response to PRWORA, the state of Maine enacted a state statute in 1997 which granted state-funded medical care to Medicaid-ineligible qualified aliens. *See* Temporary Assistance for Needy Families, 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B). The Maine Legislature provided that "recipients under this subparagraph are limited to categories of noncitizens who would be eligible for TANF or Medicaid programs but for their status as aliens under PRWORA." *Id.* § 3762(3)(B)(2). As a result, in Maine, qualified aliens subject to the five-year Medicaid residency requirement received state-funded health benefits until 2011 when the Maine Legislature eliminated the program. 2011 Me. Laws 380, § KK-4(B)(2).

### d.    The Contours of the Disputed Programs

After considering the "contours" of the programs in dispute, the Court concludes that there were two separate benefit programs: an aliens-only program and a program for citizens and qualified aliens who satisfied PRWORA's residency requirement.[5] *See Pimentel*, 670 F.3d at 1107 (reversing the Plaintiffs' preliminary injunction because "[a] careful consideration of the contours" of each benefit program "including the statutory scheme, source of funding, extent of state involvement, and history" aided the court in finding there were two separate benefit programs). The statutorily mandated separate funding structures for MaineCare,

---

[5]    The Court refers the parties to and incorporates by reference its discussion regarding the independence of the programs at issue in its Order on the Commissioner's motion to dismiss. *See Order* at 21-25.

which receives federal and state funds, and the aliens-only program, which received only state funds post-PRWORA, is the first indicator of their independence.[6] *Compare* 2001 Me. Laws 450 § C-2; *with* 8 U.S.C. § 1613(a), 1622(a), *and* 2011 Me. Laws 380, § KK-4(B)(2); *see Order* at 22-24. The laws' separate funding structures also signify that the programs were separately controlled by the governments that funded them. *Compare* 42 U.S.C. § 1396a (2000), *and* 42 C.F.R. §§ 430.0, 430.10-.20 (2002), *with* 8 U.S.C. § 1613(a), 1622(a), *and* 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B).

Moreover, the history of the benefit programs, specifically the federal government's express relinquishment of its former obligation to provide benefits for qualified aliens subject to the residency requirement and the State's decision to assume that obligation only underscores their autonomy. 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B). The resulting Maine law's statutory language, which limited state-funded benefits to "categories of noncitizens who would be eligible . . . for Medicaid programs but for their status as aliens under PRWORA", further confirms the separate nature of the programs. 1997 Me. Laws 530, ch. 1053-B § 3762(3)(B). Admittedly, the two programs were often inaccurately referred to as MaineCare, but the Court does not find that this mistake overcomes the substantive differences between the two programs. *See Order* at 24; *Def.'s Mot. to Dismiss* at 13; *Pimentel*,

---

[6]     Ms. Mayhew admits that "[a] Department administrative error led to some amount of federal money being applied to Maine's state medical assistance benefits for Medicaid-ineligible aliens. Such errors are subject to a financial reconciliation process between the Department and the U.S. Department of Health and Human Services." *Def.'s Mot. to Dismiss* at 7 n.4. The Court does not find that this error changes the program's funding structure because by statute it was not supposed to be funded with federal dollars.

670 F.3d at 1007 ("The appearance of a single program does not overcome this fact: the two programs are, in reality, two separately administered programs funded by two distinct sovereigns").

### e.    Two Separate Benefit Programs

Without the guidance of clear First Circuit precedent, the Court follows the well-reasoned legal analysis of courts in other jurisdictions, such as *Pimentel* and *Pham*.   The Court concludes that it cannot award preliminary injunctive relief to the Plaintiffs because there were two separate programs distributing medical benefits to Medicaid-ineligible qualified aliens and citizens.   Because citizens were statutorily unable to receive health benefits under the same state-sponsored program, the Plaintiffs are unable show they were similarly situated with citizens for equal protection purposes.   *Barrington Cove, LP*, 246 F.3d at 10.   In other words, the Plaintiffs cannot show that the State engaged in selective treatment because Maine's 1997 law never included the Plaintiffs in a benefit group with citizens.

The Court's conclusion is supported by a comparison of the facts in this case to those in *Pimentel*, *Pham*, and *Doe*.   In addition, the Court views the *Aliessa*, *Korab I*, and *Korab II* decisions as factually-distinguishable and unpersuasive. Moreover, under the First Circuit's "prudent person" test, looking objectively at the incidents here, the factual comparison of the Plaintiffs' aliens-only benefit program with MaineCare shows that these "cases [ ] [are not] fair cogeners" as "apples [ ] [are not being] compared to apples."   *Dartmouth Review*, 889 F.2d at 19.   Because the Plaintiffs are unable to show a likelihood of success on the merits, "the remaining

factors become matters of idle curiosity." *New Comm Wireless Servs., Inc.,* 287 F.3d at 9.  Nevertheless, for the sake of completeness, the Court addresses the remaining three injunction factors.

### 2.    Potential for Irreparable Harm

"Irreparable harm can consist of 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'"   *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 217 F.3d 8, 13 (1st Cir. 2000) (quoting *Ross-Simons of Warwick, Inc., v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996)).  To satisfy this factor, the Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction", i.e., before a decision on the merits can be rendered. *Wilson v. NRDC*, 555 U.S. 7, 22 (2008).  "A preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief."   11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1, at 149-50 (2d ed. 1995).

In their motion, the Plaintiffs claim a preliminary injunction is the only available relief because they are indigent and require immediate medical attention to fight ongoing life-threatening illnesses.[7]   *Pls.' Mot.* at 14-15.   Further, the Plaintiffs cite *Massachusetts Association of Older Americans v. Sharp*, 700 F.2d 749 (1st Cir. 1985), a Medicaid case, for the proposition that "[t]ermination of benefits

---

[7]      "Although monetary relief may compensate some class members for out-of-pocket expenditures and other injuries resulting from the wrongful denial of MaineCare, monetary damages will provide no relief against the ongoing and future violations of the Plaintiffs' and class members' constitutional rights." *First Am. Compl.* ¶ 38.

that causes individuals to forego such necessary medical care is clearly irreparable injury."[8] *Id.* at 753.  The Commissioner rejects this argument by pointing out that the Plaintiffs have other state-funded options for medical care; namely MainCare's emergency care and medically necessary inpatient and outpatient hospital care under Maine's Free Care law.  *Def.'s Opp'n* at 8.

It may be that money damages or the current state-funded medical care options would be unable to thwart the potential for irreparable injury to the Plaintiffs pending trial.  However, as later discussed, the record on this issue is undeveloped and unsatisfactory.  Not all members of the Plaintiffs' class may suffer from the same tragic illnesses as Mr. Bruns and Ms. Hassan or require the same intensity of care.  At the same time, for some of the Plaintiffs' class members, the threat of becoming sick and requiring treatment that is unavailable through the State's limited medical care options still looms.  First, MaineCare's emergency care provision is limited given it only covers an individual's health care costs if "the absence of immediate medical attention could reasonably be expected to result in - - (A) placing the patient's health in serious jeopardy, (B) serious impairment to bodily functions, or (C) serious dysfunction of any bodily organ or part."  42 U.S.C. § 1396b(v)(3).  Emergency services may be limited further to exclude "any services after stabilization of the emergency condition for non-citizens" such as "dialysis, organ transplants, school based services, personal care services, waiver services,

---

[8]      The Plaintiffs cite *Maine Association of Interdependent Neighborhoods v. Petit* to support their irreparable injury argument because "[t]he wrongful denial of governmental benefits may constitute irreparable injury . . . ."  647 F. Supp. 1312, 1315 (D. Me. 1986).  The key word is "wrongful", and because the Court ultimately does not find that the termination of benefits in the State's aliens-only program was wrongful, *Petit* is distinguishable.

27

nursing facility services and hospice services."[9]   10-144-101 ME. CODE R. §§ 1.02-4(C), 1.06.   The State's Free Care law also has limited health care offerings as it simply requires hospitals to provide free inpatient and outpatient care if the individual meets the relevant income guidelines, is not covered by insurance, and the "services received were medically necessary."   10-144-105 ME. CODE R. §§ 1.01, 1.05(B).

The First Amended Complaint and relevant affidavits suggest that both Mr. Bruns and Ms. Hassan are receiving some medical treatment from the State, and that this treatment is not enough to cure their illnesses.   *See First Am. Compl.* ¶¶ 10-13; *Pls.' Mot.* Attach 2, *Aff. of Danielle N. Margalit, M.D.* (ECF No. 5-2) (*Dr. Margalit Aff.*), Attach 3, *Aff. of Mary Allen, FNP* (ECF No. 5-3) (*Allen Aff.*).   Thus, according to the allegations in the First Amended Complaint, there is a significant possibility that their health will deteriorate dramatically or that they may die from their illnesses while waiting to fulfill PRWORA's residency requirement and reach trial.[10]   The fact that Mr. Bruns is now terminally ill and Ms. Hassan may die

---

[9]      The Plaintiffs assert that "[a]lthough the rule for Emergency MaineCare pertains expressly to undocumented non-citizens, Defendant appears to also be applying the rule to all legal non-citizens who are not eligible for full MaineCare."   *Pls.' Mot.* at 4, n.4; *see* 10-144-101 ME. CODE R. § 1.02-4(C).   The State's failure to include "undocumented" in Section 1.06's description of the Emergency Services exclusion combined with the denial of Ms. Hassan's kidney transplant and Mr. Brun's appointment at the Dana Farber Cancer Institute suggests that the limitation in Rule 1.02-4(C) may be applied to all non-citizens receiving emergency care.   10-144-101 ME. CODE R. § 1.06; *First Am. Compl.* ¶¶ 12-13; *Pls.' Reply* Attach 1, *MaineCare Denial Notice* (ECF No. 16-1).

[10]      Tragically, Mr. Bruns is now terminally ill and receives hospice care.   *First Am. Compl.* ¶ 1. Also, because Mr. Bruns became a lawful permanent resident on December 16, 2007, PRWORA should not bar him from accessing full MaineCare benefits as long as he maintained "qualifying status" for the past five years.   *Id.* ¶ 10; *see* 8 U.S.C. § 1613(a).   As of the date of this Order, the parties have not provided any further update on Mr. Bruns' status.

It may be that, based on these new developments, Mr. Bruns' quest for a preliminary injunction is moot.   However, despite questions about Mr. Bruns' continuing standing, the Plaintiffs' motion for a preliminary injunction (brought on behalf of himself and his fellow class members)

prematurely if she does not receive a necessary kidney transplant only underscores the potential for irreparable harm to the Plaintiffs. *First. Am. Compl.* ¶¶ 13, 36; *see Wilson,* 555 U.S. at 22.

At the same time, the Plaintiffs have presented the Court with a truncated record for purposes of the motion for preliminary injunction. They are relying on a motion filed on April 19, 2012, when the only Plaintiff was Mr. Bruns. *Pls.' Mot.* To that motion, they attached three affidavits concerning Mr. Bruns and his medical condition. These affidavits establish that his medical condition is potentially dire; however, there is no information about the cost of his treatment and his affidavit merely says that he has "very little money", nothing more. *Aff. of Hans Bruns* ¶ 7 (ECF No. 5-1); *Dr. Margalit Aff.*; *Allen Aff.*

The Plaintiffs included Ms. Hassan as a co-plaintiff in their First Amended Complaint, which was filed well after their motion for preliminary injunction. For whatever reason, they never filed any affidavits in support of her allegations, leaving the Court only with the unsworn allegations in the First Amended Complaint, many of which the Commissioner has denied. *See First Am. Compl.*; *Def.'s Ans.* ¶¶ 12-13. On December 18, 2012, the Court discussed with counsel the possibility of developing a more complete record for purposes of the motion for preliminary injunction; however, the Plaintiffs were determined to proceed forward on the record then before the Court. Unfortunately, the record is extremely thin. As regards Ms. Hassan, it contains unsworn, unverified and largely denied factual

---

survives as the Plaintiffs timely amended their original complaint and added Ms. Hassan before Mr. Bruns became eligible for full MaineCare benefits. *See First Am. Compl.* Given Ms. Hassan's immigration status and medical condition, she can properly pursue this motion for the class.

allegations.   It contains no reliable information about the availability of other private, charitable, or governmental sources of funding.  In short, there is very little concrete information in this record to sustain the Plaintiffs' claims of irreparable harm.

Using Mr. Bruns and Ms. Hassan as examples, although a potential for irreparable harm may exist with respect to their fellow class members, the Plaintiffs have not made out an adequate case on this record for irreparable injury to justify the issuance of injunctive relief.

### 3.    Balance of the Relevant Impositions

The Court must also balance each party's potential hardships.  The Plaintiffs argue that without "charity care" from Maine hospitals, they will be forced either to pay for treatment or to forego treatment altogether.  *Pls.' Mot.* at 16.  They argue that the State's relatively minor savings do not justify cutting off health care benefits that could prevent human suffering.  *Pls.' Reply* at 6-7; *Pls.' Mot.* at 16 (arguing that a savings of $1,279,555 for fiscal year 2012, which is only 0.1932% of the $662,057,680 MaineCare budget for 2012 was insignificant).  In opposition, the Commissioner asserts that state-funded programs for free care and emergency care adequately address the Plaintiffs' health care needs.  *Def.'s Opp'n* at 8-9.  If hospitals are allowed to transfer health care costs to the State, she argues that it would impose severe hardship on the State and contribute to its current budgetary crisis.  *Id.*

Neither argument tips the balance.  On one hand, if the Court denies the preliminary injunction, the Plaintiffs appear to be receiving some medical care and could receive care from the State in the event of an emergency, even though they require more services to fully treat their illnesses.[11]  On the other hand, if the Plaintiffs' motion is granted, it is unclear, based on the record before the Court, exactly how much the preliminary injunction will cost the state of Maine.  As both these hardships are substantial and do not obviously outweigh each another, this factor is neutral.

### 4.    Effect of the Court's Ruling on the Public Interest

The final factor the Court must assess is the likely effect of the preliminary injunction on the public interest.  The Plaintiffs argue that the public interest would be furthered by a preliminary injunction because it would stop the Commissioner's violation of their constitutional rights and would uphold the public's interest in preserving those rights.  *Pls.' Mot.* at 16-17.  Citing the current budgetary crisis, the Commissioner argues that a preliminary injunction would harm the public interest because it would burden the State with more costs.  *Def.'s Opp'n* at 8-9.  The Plaintiffs balk at the Commissioner's argument because it is "appalling that the Defendant argues that a miniscule cost savings of only .19% of the MaineCare

---

[11]     The Plaintiffs cite *Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983) to support their argument that the balance of equities weighs in their favor.  *Pls.' Reply* at 7.  Although at first glance *Lopez* is compelling, it is factually distinguishable from this case because it dealt with the Secretary of Health and Human Services' denial of disability benefits to certain individuals based upon the Secretary's determination that they were no longer be disabled.  *Lopez*, 713 F.2d at 1433-34, 1437.  Further, the cases are grounded in distinct federal law contexts, involve different populations, and have different remedies available to address hardship.

General Fund Budget outweighs at least 500 Maine residents' need to access necessary medical care."[12] *Pls.' Reply* at 6-7.

First, the Court concludes that the Plaintiffs have not established that the Commissioner violated their equal protection rights. Therefore, the public's interest in preserving constitutional protections is not an issue. Next, although the public has an interest in ensuring the health and welfare of the people living in its community, "preserving the Plaintiffs' health and well-being comes at a cost and must be balanced against other public interests, one of which is solvency." *Bourgoin v. Sebelius*, No. 2:13-cv-00055-JAW, 2013 Dist. LEXIS 27680 at *36 (D. Me. Feb. 28, 2013). Accordingly, the Court does not find the Commissioner's cost argument "appalling" especially since a preliminary injunction would affect both the interests of the taxpayers' within the State and the State's own economic interests. Fundamentally, where, as here, the public interest is inherently tied to the government's policy decisions, the appropriate balance of the public interest "must be struck through the political process, not by an order of this Court." *Id*. The Court therefore concludes that this factor is neutral and does not favor either party.

### 5.   Summary

As the Court concludes that the Plaintiffs have failed to demonstrate a likelihood of success on the merits, the "sine qua non" of the four-part preliminary

---

[12]     The Plaintiffs cite the Commissioner's memorandum to the State Legislature's Appropriations and Financial Affairs Committee, which reports cost savings of $1,279,555 (0.1932% of the overall MaineCare Budget for fiscal year 2012) due to its limitation of medical assistance benefits. Mary C. Mayhew, *Shortfall-Analysis* 6, 8 (Dec. 9, 2011) http://www.maine.gov/dhhs/budget/2012-2013/documents/MaineCare-Shortfall-Analysis.pdf.
Although this chart gives information on savings to the State, it is still unclear how much a preliminary injunction would actually cost the state of Maine.

injunction test, the Court must deny their requested relief.  *See New Comm Wireless Servs., Inc.,* 287 F.3d at 9 ("[T]he sine qua non of this four-part inquiry is likelihood of success on the merits").  Moreover, because of the inadequate state of the record, the Plaintiffs have failed to demonstrate that the remaining three factors are in their favor.

## IV.    CONCLUSION

The Court DENIES the Plaintiffs' Motion for Preliminary Injunction (ECF No. 5).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 14th day of March, 2013